UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JAVON LAMAR TORBERT,

Plaintiff,

v.

WILLIAM D. GORE, Sheriff of San Diego Sheriff Department; DEPUTY DAILLY, Sheriff of San Diego Sheriff Department; DEPUTY McMAHON, Sheriff of San Diego Sheriff Department; DEPUTY Y.G. GEBREBIORGIS, Sheriff of San Diego Sheriff Department; SERGEANT ESTRADA, Sheriff of San Diego Sheriff Department; COUNTY OF SAN DIEGO; and DOES 1-50,

Defendants.

Case No.: 14cv2911 BEN (NLS)

**REPORT AND RECOMMENDATION FOR ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**[Dkt. No. 71]**

Plaintiff Javon Lamar Torbert, a prisoner proceeding pro se and in forma pauperis, filed this civil rights action alleging excessive force, cruel and unusual punishment, deliberate indifference, and several state law claims arising from two alleged incidents. In the first incident, he alleges that on October 2, 2014—while housed at the Vista Detention Center—one of the Defendants slammed a metal door on his left arm.  In the second incident, he alleges that on October 21, 2014—while housed at the Central Jail— one or more Defendants took him to the ground following a doctor's appointment. Torbert also asserts *Monell* allegations against the County of San Diego.

Following an extended discovery period, Defendants filed this motion for summary judgment seeking judgment in their favor on all claims.  Defendants, and the court, notified Torbert of the requirements for opposing summary judgment pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998 (en banc)).[1]  The court granted Torbert two extensions of time to file his opposition, which he ultimately filed.  Defendants filed a reply.

For the following reasons, the court **RECOMMENDS** that the district judge **GRANT in part** and **DENY in part** Defendants' motion for summary judgment.

## I.    STATEMENT OF FACTS[2]

In August 2014, Torbert was arrested while out on parole.  Defs.' Notice of Lodgment (D-NOL) Ex. A (Torbert Depo.) 8:7-24; Ex. B (Stipulated Sentence Rpt.) p.3; Webster Decl. ¶ 3.

### A. October 2, 2014 Incident.

On October 2, 2014, Torbert was housed at the County's Vista Detention Facility in Medical Ward 2, a medical dormitory.  McMahon Decl. ¶ 3.  At approximately 19.20 hours, staff reported that Torbert was causing tension in Medical Ward 2 by yelling and

---

[1] *Klingele* and *Rand* require the district court to ensure that a pro se prisoner has been given "fair notice ... of the requirements and consequences of a summary judgment motion."  *County of Los Angeles v. Beltran*, 514 F.3d 946, 952 (9th Cir. 2008).
[2] The facts are generally undisputed.  Any disputed facts are noted.

making threats.  McMahon Decl. ¶ 3.  Torbert says he was upset because he learned, through an email from his family, of a restriction on his prison account.  Opp'n, p.2.  He said that "he needed some help or something bad was going to happen." *Id.*  Deputy McMahon went to speak with Torbert through the door of Medical Ward 2, and he explained to her what was wrong.  McMahon Decl. ¶ 4; Opp'n, p.2.  Deputy McMahon says that Torbert was yelling.  McMahon Decl. ¶ 4; D-NOL Ex. G, 10/2/14 Video at 19:18; Dailly Decl. ¶ 3.  Defendant Estrada told Torbert to gather his belongings so he could move to a different cell.  McMahon Decl. ¶ 4; Estrada Decl. ¶ 3; D-NOL Ex. A, Torbert Depo. 28:15-17; Opp'n, p.2.  Torbert did not submit to handcuffing through the cell door.  McMahon Decl. ¶ 4; D-NOL Ex. A, Torbert Depo. 28: 5-10.

Deputies McMahon and Dailly then entered Medical Ward 2.  D-NOL Ex. G, 10/2/14 Video at 19:22:40.  Deputy Dailly took Torbert's cane.  D-NOL Ex. G, 10/2/14 Video at 19:22:48; Opp'n, p.3.  Deputy Dailly says he took it for safety reasons and because Torbert had been observed walking earlier without it.  Dailly Decl. ¶ 4; McMahon Decl. ¶ 7; Opp'n, p.3.

Sergeant Estrada and eventually two other deputies arrived at Medical Ward 2.  McMahon Decl. ¶ 5; Opp'n, pp.2-3; Estrada Decl. ¶ 3.  Defendants McMahon and Estrada say that Torbert said something to the effect that they would need the other deputies; they perceived this to be a threat.  McMahon Decl. ¶ 6; Estrada Decl. ¶ 3.  Torbert then gathered his belongings.  D-NOL Ex. A, 10/2/14 Video Footage at 17:24.  Deputy Dailly returned the cane to him to walk to the medical isolation cell.  D-NOL Ex. G, 10/2/14 Video at 19:24:25; Dailly Decl. ¶ 5; McMahon Decl. ¶ 8; Opp'n, p.3.

When they reached the medical isolation cell, Torbert faced the wall opposing the door while Deputy Dailly unlocked the door.  D-NOL Ex. G, 10/2/16 Video at 19:25:15; Opp'n, p.3.  As Torbert turned and began to walk into the cell with his cane, Deputy Dailly went to take the cane away from Torbert.  D-NOL Ex. G, 10/2/16 Video at 19:25:19.  At this point, the witness accounts vary.  Deputy McMahon and Sergeant Estrada say that Torbert "reached his arm out of the cell door" while Dailly was closing

1    it, implying that Torbert's arm was first in the cell, and then emerged as the door was

2    closing.  McMahon Decl. ¶ 8; Estrada Decl. ¶ 4.  Deputy Dailly says that Torbert "went

3    to grab the cane," without providing any context of where his arm came from.  Dailly

4    Decl. ¶ 5.  Torbert describes the event as Deputy Dailly attempting to grab the cane while

5    simultaneously slamming the metal door on Torbert's arm.  Opp'n, p.3.  He says he did

6    not "thrust [his] hand out."  Torbert Decl. ¶ 2 (attached to Opp'n).

7         The video footage shows that Torbert backed into the cell with his left arm

8    outstretched—either maintaining the grasp on his cane or trying to reach for his cane—

9    and Dailly shut the door on Torbert's arm.  D-NOL Ex. G, 10/2/16 Video at 19:25:19.

10   The incident took place over three seconds.  *Id.*  According to the video, Torbert had not

11   completely entered the cell before the door was slammed on his arm.  *Id.*  After the arm

12   was slammed, Deputy Dailly reopened the door, at which Torbert pulled his arm into the

13   cell, and then Dailly closed it.  *Id.*

14        Torbert says he immediately felt a "sharp tingly pain from his elbow to his hand

15   and barely could move his fingers."  Opp'n, p.3.  He said he pushed the emergency

16   button for help but no one responded for 13 hours.  *Id.*; Torbert Decl. ¶ 5.  Torbert says

17   he suffered tremendously with pain and panic throughout the night until he was woken up

18   at 8:30 a.m. the next morning.  Opp'n, p.3.  Deputy McMahon states that "[M]edical staff

19   reported they were unable to treat Plaintiff [that night] because he was acting

20   unpredictably."  McMahon Decl. ¶ 9.  But detention staff provided pain medication to

21   Torbert that night.  *Id.*; Torbert Decl. ¶ 13.  Also, Deputy McMahon says that at around

22   22:25 hours, she observed Torbert banging on the glass of the cell with his "injured"

23   hand.  McMahon Decl. ¶ 10.

24        Torbert's medical records show that at 8:56 hours the next morning, Dr. Martinez

25   examined Torbert's forearm and ordered an x-ray.  Dr. Joshua Decl. ¶ 8; Opp'n, p.3.  On

26   October 4, 2016 Torbert went to Tri City Medical Center by ambulance because he

27   complained of nerve pain shooting to his chest.  Dr. Joshua Decl. ¶ 9; Opp'n, p.3.

28   Cardiac tests were negative and Torbert believed the pain was coming from his arm.  *Id.*

While at the hospital, his left wrist and forearm were x-rayed, and the x-rays showed he did not suffer any fractures. [3]  *Id.*  At that time Torbert was taking three different pain medications.  *Id.*

Upon return to the jail Torbert was given a sling to keep his arm elevated, as the hospital doctor had ordered.  Opp'n, p.3.  On October 7, 2014, a jail nurse examined Torbert and noted he remained on the pain medications and could move his left fingers.  Dr. Joshua Decl. ¶ 10.  On October 9, Torbert was transferred to San Diego Central Jail.  Opp'n, p.3.  On October 17, Dr. Serra examined Torbert, and noted he was no longer taking two of the three pain medications.[4]  Dr. Joshua Decl. ¶ 11.  Also on October 17, Deputy Brown observed Torbert doing pull-ups and push-ups in the medical housing unit.  Brown Decl. ¶ 3.  He drafted an Incident Report on Torbert because inmates are not permitted to work out in the medical ward.  *Id.*; D-NOL Ex. F.

**B. October 21, 2014 Incident.**

Torbert went to see Dr. Sadler on October 21, 2014 at 14.45 hours, the fourth jail physician to examine his arm.  Gebregiorgis Decl. ¶¶ 3, 12; Opp'n, p.4.  Deputy Gebregiorgis was monitoring Torbert during the appointment.  Gebregiorgis Decl. ¶ 3.  Torbert expressed to Dr. Sadler frustration with his medical treatment because he had not seen a neurologist and was cut off from certain pain medication.  *Id.*; Opp'n, p.4.  Dr. Sadler noted that Torbert showed decreased strength from the arm even though he was using his left hand spontaneously.  Dr. Joshua Decl. ¶ 12; D-NOL Ex. I, p.179.  She suspected that the decreased arm strength was due to poor effort.  *Id.*  At the end of the

---

[3] In the Opposition Torbert says that during the hospital visit he was told to have Detention reschedule an appointment with a nerve specialist at the hospital.  The court reviewed the Tri-City Medical Records in Torbert's Notice of Lodgment, Ex. B, but did not see such an instruction.

[4] Torbert says that the doctor noted the chest pain likely came from chronic shoulder pain due to the arm injury. Opp'n, p.3.  The court reviewed the Medical Records in Torbert's Notice of Lodgment, Ex. C, but did not see such a notation.

appointment Dr. Sadler recommended an x-ray for Torbert's elbow but did not recommend a referral to a neurologist, noting that her observations were inconsistent with his complaints of nerve pain. *Id.* She also noted that Torbert became verbally aggressive. *Id.* Dr. Sadler told Torbert the appointment was over. Gebregiorgis Decl. ¶ 4; Opp'n, p.4. Deputy Gebregiorgis, who had stepped in, told Torbert to leave the examination room. *Id.* Dr. Sadler noted that Torbert became physically aggressive with the deputies. D-NOL Ex. I, p.179.

Here, the witness accounts diverge. Torbert says that when he was approximately one foot out of the room Deputy Gebregiorgis pushed him from behind. Opp'n, p.4. Startled, Torbert says he got his balance, turned toward Deputy Gebregiorgis, and then was attacked by him and another deputy, placed in a chokehold and taken to the ground, all while bending his injured arm. *Id.* Deputy Gebregiorgis describes it differently:

> Dr. Sadler explained that the medical examination was complete and I instructed Plaintiff to step down from the examination table. Plaintiff complied. I stepped closer to Plaintiff in case he attempted to harm Dr. Sadler. Plaintiff instantly stated, "Don't touch me." Due to his unpredictable behavior and proximity to the physician, I placed my right hand on Plaintiff's left arm in order to escort him out of the examination room. Plaintiff yanked his left arm out of my grasp, turned to face me and squared his shoulders. Plaintiff's fists were clinched at his side. I perceived that he was going to assault me. As I attempted to secure Plaintiff, he started to raise his arms as if he was going to strike me. To prevent Plaintiff from attacking me, I grabbed him by his shirt collar and shoulder area and pulled him forward to take him to the floor. Plaintiff pushed me away with both of his hands. I continued to hold onto Plaintiff's shirt as Deputy Finley arrived to assist. Plaintiff was struggling with me and I pushed him against the nurse's desk. He refused to allow Deputy Finley and myself to gain control of his hands.
>
> Deputy Finley and I, working together, were able to push Plaintiff down by the back of his neck and shoulder area. This bent Plaintiff at the waist and we were able to take him to the

floor.  Once on the floor, we were able to apply bodyweight to gain control of Plaintiff's hands and prevent him from getting up.  Other deputies arrived and we were able to put Plaintiff in wrist and ankle restraints.

Gebregiorgis Decl. ¶¶ 4-5.

The video captures the hallway just outside the medical examination room.  The footage shows that Deputy Gebregiorgis stepped into the examination room at 14:46:26.  D-NOL Ex. G, 10/2/14 Video at 14:46.  A second deputy and a medical worker standing outside the examination room suddenly turned to pay attention to what was going on in that room.  *Id.*  Torbert walked out of the room at 14:46:35, while throwing his left arm up.  *Id.*  He turned around to face Deputy Gebregiorgis, who grabbed him.  *Id.*  Deputy Finley grabbed Torbert from behind.  *Id.*  Torbert's fists appeared clenched as he raised his arms.  *Id.*  Both deputies struggled with Torbert, and at 14:46:40—five seconds after Torbert exited the examination room—the deputies got Torbert to the floor.  *Id.*  They had his arms secured behind him eight seconds later, at 14:46:48.  *Id.*

## C.  **Use of Cane.**

Torbert was prescribed use of a cane on September 20, 2014, to help him deal with the pain he felt in his feet.  Dr. Joshua Decl. ¶ 15; Opp'n, p.5.  Dr. Martinez discontinued use of the cane on October 3, 2014, noting that he was told it was not used as prescribed and there was an instance where Torbert used the cane as a weapon.  *Id.*  On the video footage from October 2, Torbert is seen pacing through the medical ward for at least six minutes without use of his cane before any deputy even came to the ward.

## II.   **LEGAL STANDARDS**

### A.  **Summary Judgment.**

Summary judgment is appropriate when there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" when it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party can establish an absence of a genuine issue of material fact by (1) presenting evidence that negates an essential element of the non-moving party's case; or (2) demonstrating that the nonmoving party failed to establish an essential element of that party's case. *Celotex*, 477 U.S. at 322-323. The moving party must identify the pleadings, depositions, affidavits or other evidence that the party "believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323.

If the moving party meets this burden, the non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The court must view the underlying facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## B. Section 1983 Cases.

"[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-394 (1989) (citation omitted). To prevail on a section 1983 claim, a claimant must prove that: (1) a person acting under color of state law committed the conduct at issue; and (2) the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States. 42 U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (en banc).

Defendants do not dispute that they were acting under color of state law. Rather, they argue that there are no triable issues of fact as to whether they violated any of Torbert's rights protected by the Constitution.

/ / /

14cv2911 BEN (NLS)

## C. **Applicable Standard for Excessive Force Claims for a Parolee.**

No single standard governs excessive force claims brought under section 1983. *Graham*, 490 U.S. at 393-394.  Excessive force claims for convicted persons are evaluated under the eighth amendment standard.  *Id.* (stating that excessive force claims by prisoners are evaluated under the eighth amendment while those alleged by free persons are evaluated under the fourth amendment).  Here, Torbert was arrested while on parole.  He argues though that no parole hold was placed on him, and thus his claims should be evaluated under the fourteenth amendment because he was a pretrial detainee.

As a parolee, Torbert is considered a convicted person who is serving "a portion [of his sentence] under supervision outside prison walls."  *U.S. v. Paskow*, 11 F.3d 873, 881 (9th Cir." 1993).  Because a parolee is a "convicted person" still serving a sentence, the eighth amendment standard—as opposed to the fourteenth amendment standard used for pretrial detainees—applies to Torbert's excessive force claims.  *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (explaining that the due process clause applies to claims by pretrial detainees while a claim by a sentenced inmate is analyzed under the eighth amendment).

## III.    DISCUSSION

### A. **Eighth Amendment: Claims 1, 2 and 3 for Cruel and Unusual Punishment.**

In Claim 1, Torbert alleges excessive force based on the October 2 and October 21 incidents.  Compl., p.3.  In Claim 2, Torbert alleges cruel and unusual punishment based on Defendants' failure to return his cane to him.  Compl., p.4.  In Claim 3, Torbert alleges deliberate indifference to his medical needs following the October 2 incident.  Compl., pp.4-5.

#### 1. **Excessive Force.**

The eighth amendment prohibits the imposition of cruel and unusual punishment and protects prisoners from "inhumane conditions of confinement."  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation and quotations omitted); *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006).  Specifically, it protects those already convicted of

9

crimes from "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citations and quotations omitted). In evaluating whether a prison official used excessive physical force in violation of the eighth amendment, the inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

In addition to the subjective standard based on the defendant's intent, courts look at whether the force was objectively unreasonable. To determine this objective test, the court must consider (1) the threat perceived by the prison official; (2) the need to use force; (3) the relationship between the need for force and the amount of force used; (4) any efforts made to minimize the force; and (5) the degree of injury inflicted. *Id.* An inmate need not suffer a serious injury for force to be deemed excessive but the lack of a serious injury is relevant to the analysis. *Id.*

When reviewing an excessive force claim, courts must give deference to prison officials when a "security measure [is] taken in response to an actual confrontation with riotous inmates[.]" *Whitley*, 475 U.S. at 322. This deference "does not insulate from review actions taken in bad faith and for no legitimate purpose[.]" Rather, it prevents finders of fact from "substitut[ing] their judgment for that of officials who have made a considered choice." *Id.*[5]

### a. Excessive Force: October 2 Incident (Claim 1).

Defendants argue there can be no excessive force liability because no force was used on Torbert during the October 2 incident, as the injury was caused by Torbert's own act of reaching his arm out the door to reach for the cane. They also argue that there is no

---

[5] Even if Torbert were to be deemed solely a pretrial detainee and not a convicted person, the Supreme Court recently adopted this same "objective standard" test from eighth amendment case law when looking at excessive force claims by pretrial detainees. *See Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015). The difference between the test for pretrial detainees and convicted persons is there is no subjective standard that takes into account a defendant's state of mind for claims by pretrial detainees. *Id.*

evidence Torbert suffered a lasting injury from the impact of the door.  Torbert, though, argues that while he still had a grip on the cane, Deputy Dailly slammed the door on his arm.

In support of their argument that no force was used on Torbert, Defendant witnesses say that Torbert was in the cell already and stuck his arm out the door as Deputy Dailly was closing it.  Deputy Dailly explains that he was concerned that Torbert would use the cane as a weapon, so he decided to take it away.  Dailly Decl. ¶ 5.  He says he did not intend to slam the door on Torbert's arm.  *Id.*  He thus characterizes the door slam on Torbert's arm as an accident.  By framing it as an accident, inquiries as to whether the force was necessary or could have been minimized would be irrelevant because Dailly's position is that *he* did not use force on Torbert.

The video contradicts the portrayal of the door slamming by Defendants.  The footage shows Torbert backing into the cell with his left arm outstretched—and either maintaining a grasp on his cane or trying to reach for his cane—and Dailly shutting the door on Torbert's arm.  D-NOL Ex. G, 10/2/16 Video at 19:25:19.  At no point before the door slamming had Torbert's arm actually gone into the cell.  Therefore, there is no basis to argue that Torbert's arm emerged from the cell to the surprise of Deputy Dailly.  The video shows that as Dailly was putting Torbert into the cell, Torbert's arm remained grasping at the cane, and without him ever completely releasing the cane, Dailly slammed the door on Torbert's arm.  There is a question of fact as to whether Deputy Dailly intended to apply the force of the door on Torbert's arm to get him to release the cane.  In other words, the question is whether Dailly applied the force of the door in a good faith effort to restore discipline and order and not "maliciously and sadistically for the very purpose of causing harm."  *Whitley*, 475 U.S. at 320–321.  Given the video evidence and Torbert's corroborative statements, this is a question to be presented to the trier of fact.

If the trier of fact finds that Dailly used force intentionally, there will also be questions of fact as to the threat Dailly perceived, the need to use that force or if another means was available, and the degree of injury inflicted.  Because only Defendant Dailly

applied the force in this incident he is the only one who may be liable for it.  Therefore, this court recommends that the district judge **DENY** the summary judgment motion as to Defendant Dailly on Claim 1 for the October 2 incident and **GRANT** it as to Defendants Estrada, McMahon and Gebregiorgis.

### b. Excessive Force: October 21 Incident (Claim 1).

Defendants admit to using force in the October 21 incident.  But they argue it was constitutional because of Deputy Gebregiorgis' perceived threat and the minimal amount of force used.  Torbert argues that Deputy Gebregiorgis attacked him even though he was voluntarily leaving the examination room and did not start resisting until he was placed in a chokehold by Deputy Finley.

Here, Dr. Sadler noted that Torbert became verbally aggressive.  Deputy Gebregiorgis says he perceived a threat and stepped closer to Torbert in case he attempted to harm Dr. Sadler.  The video shows another deputy and a medical worker come to attention outside the room, implying that something of concern was going on in the examination room.  Deputy Gebregiorgis says he placed his right hand on Plaintiff's left arm.  As seen on the video, Torbert yanked his left arm out of Gebregiorgis' grasp and turned to face him.  The video also shows Deputy Finley grabbing Torbert from behind and placing him in a chokehold.  Torbert's fists appeared clenched as he raised his arms.  Then both deputies struggled with Torbert and got him to the floor.  Five seconds elapsed from the time Torbert exited the examination room to when he was on the floor. Torbert admits, and as is seen on the video, that he was resisting the deputies once he was grabbed from behind.  Opp'n, p.8.  Eight seconds later, the deputies secured Torbert's arms secured behind his back.  Torbert does not report any injury from this incident other than soreness on his arm for a few hours.

Considering Dr. Sadler's notation of the verbal aggression, Torbert's admitted frustration with his medical appointment and Deputy Gebregiorgis' role to protect Dr. Sadler from harm, there appeared to be a legitimate need to use force.  The type of force used was the restraining of Torbert by two deputies.  Torbert was contained within five

seconds, and completely restrained within 13 seconds, all while he resisted the deputies' efforts. There is minimal injury noted. Deputy Gebregiorgis appeared to take the action as a security measure to protect Dr. Sadler, serving a legitimate purpose. The court finds that there is no question of fact as to whether the force used was excessive to the apparent threat and situation. It was not. Therefore, the court recommends that the district judge **GRANT** summary judgment to all Defendants on Claim 1 for the October 21 incident.

### c. *Qualified Immunity.*

Defendants argue the individual defendants are entitled to qualified immunity. Given this court's findings, this analysis is required only for Defendant Dailly as to Claim 1. Qualified immunity entitles government officials to "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Generally, the qualified immunity doctrine must "'give[] ample room for mistaken judgments by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229 (1991). Even if a constitutional violation occurred, the officer should prevail if the plaintiff's right "was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

Defendants do not argue that the right to be free from cruel and unusual punishment was not clearly established. Instead, Defendant Dailly argues it is Torbert's burden to prove that the unlawfulness of the conduct is apparent in light of pre-existing law. Because this is an eighth amendment claim, he argues that Torbert must prove the "malicious and sadistic" intent required for excessive force claims. Deputy Dailly also argues that because no evidence shows he caused Torbert to thrust his hand out of the cell while the door was closing and because he did not intend to harm Torbert, no facts show

1  that Dailly should have known his conduct was clearly unlawful.

2  Taking the evidence in the light most favorable to Torbert, this court found a

3  question of fact as to Deputy Dailly's intent when he slammed the door on Torbert's arm.

4  Specifically, there is a question of fact as to whether the door was slammed in a good

5  faith effort to restore discipline or was done maliciously and sadistically for the purpose

6  of causing harm.  While Torbert has not yet proven intent, he should at least get the

7  opportunity to present this factual question to the jury.  Given the question of fact on

8  intent, Dailly's argument for qualified immunity fails.  *Compare Clement v. Gomez*, 298

9  F.3d 898, 903-904 (9th Cir. 2002) (granting qualified immunity on an eighth amendment

10 excessive force claim because plaintiffs could not establish that the defendants

11 maliciously and sadistically applied force for the purpose of causing harm).  The court,

12 therefore, recommends that the district judge **DENY** summary judgment on the basis of

13 qualified immunity.

14  ## 2.  Deliberate Indifference (Claims 2 and 3).

15 The government must "provide medical care for those whom it is punishing by

16 incarceration," and cannot act with deliberate indifference to a prisoner's serious medical

17 needs.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A prison official acts with deliberate

18 indifference if the official "knows of and disregards an excessive risk to inmate health or

19 safety."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Deliberate indifference is also

20 known as the "unnecessary and wanton infliction of pain."  *Estelle*, 429 U.S. at 104

21 (internal quotations omitted).  To prevail, a plaintiff must make (1) an objective showing

22 that he had a serious medical need; and (2) a subjective showing that the specific

23 defendants were deliberately indifferent to that need.  *Id.; Farmer*, 511 U.S. at 837;

24 *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014).

25 Here, Torbert alleges deliberate indifference based on Defendants' failure to return

26 the cane to him (Claim 2).  He also alleges it based on his not being seen by a doctor until

27 13 hours after his arm was slammed in the door (Claim 3) and not being referred to a

28 neurologist (Claim 3).

### a. Failure to Return Cane (Claim 2).

Torbert complains that Defendants made him walk without a cane to appointments, even though he possibly had glass in his foot as well as painful callouses.  Compl., p.4.  Defendants state that Torbert was observed walking around without a cane and that they had a legitimate penological interest in taking the cane away following the October 2 incident because he could have used it as a weapon.

Torbert does not make an objective showing that he had a serious medical need for the cane.  He said he needed it for painful callouses.  But Torbert admits those callouses were being treated with daily foot soaks and medication to control the ongoing foot pain and discomfort.  Compl., p.17, ¶ 41.  Notably, though, the video footage from October 2 shows Torbert pacing through the medical ward for at least six minutes without use of his cane.  After he demonstrated agitation, Defendants let him walk with the cane to the isolated medical cell.  They only took the cane away as he entered the cell.  In light of the Defendants having observed Torbert walk without a cane, and his agitated state, they took away Torbert's cane as a security measure.  There is no question of fact raised that their actions were taken in bad faith or for no legitimate purpose.  *Whitley*, 475 U.S. at 322.  Without an objective showing that he needed the cane or a subjective showing that they acted in bad faith, Defendants cannot be found to have been deliberately indifferent to his medical need for a cane.  This court therefore recommends the district judge to **GRANT** summary judgment for all Defendants as to Claim 2 for failure to return the cane.[6]

---

[6] In the Opposition, Torbert mentions a new basis for deliberate indifference, arguing that his statement "something bad is going to happen" was not a threat but actually a cry for help, and thus Defendants were deliberately indifferent to his mental health needs.  Opp'n, p.12.  But Defendants transported Torbert to an isolated medical cell, where he was monitored by medical staff.  Torbert also says he "was under the care of a licensed psychiatrist for mental distress and on medications to tend to these illnesses while in custody."  Compl., p.20, ¶ 60.  The court finds no plausible basis for a deliberate indifference claim based on Torbert's mental health.

### b. Wait Period Before Seeing Doctor for Arm Injury and Failure to Send Torbert to a Neurologist (Claim 3).

To determine whether there is an objective showing of a serious medical need, the court must look at whether the "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir. 1991) overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (citation omitted).  Torbert claims that he waited 13 hours in pain before he saw a doctor for his injured arm and that he never went to a neurologist.

Torbert suffered his injury around 19:24 hours.  He admits that "Defendant Dailly did make an attempt by giving Plaintiff 3 tylenols in a plastic cup to make Plaintiff stop complaining."  Compl., p.5; Torbert Decl. ¶ 13 ("Defendant Dailly at 9:40 p.m. …gave the Plaintiff 3 tylenols").  Deputy McMahon explained that medical staff could not treat Torbert that night because he was acting unpredictably.  McMahon Decl. ¶ 9.  Torbert says that the next morning after the injury, he received motrin and x-rays on his forearm and wrists.  Opp'n, p.10.  Torbert's medical records show that at 8:56 hours the next morning Dr. Martinez examined Torbert's forearm and ordered an x-ray.  Dr. Joshua Decl. ¶ 8; Opp'n, p.3.  Torbert himself says he "was seen over seven times in nineteen days by medical professionals."  Opp'n, p.10.  His medical records show that he was seen by four doctors and one nurse in the 19 days.  Dr. Joshua Decl. ¶¶ 8-12.  He received x-rays, an EKG and a cardiac work-up.  *Id.*  No doctor believed a neurology referral was warranted.  Dr. Joshua Decl. ¶ 13.

Because Torbert received pain medicine soon after the injury, had numerous medical appointments to follow up on his injury starting early the next morning, and all medical exams revealed no lasting injury to the arm, there is no question of fact as to whether Defendants were deliberately indifferent to his medical needs by making him wait overnight to see a doctor or by failing to send him to a neurologist.  No objective medical evidence shows that either an immediate visit to a doctor was necessary, or that

referral to a neurologist was warranted. The court, therefore, recommends that the district judge **GRANT** summary judgment in favor of all Defendants on Claim 3.

### B. *Monell* Allegations.

Torbert alleges a *Monell*[7] claim based on the County's alleged failure to adequately train deputies, including: failure to properly train deputies with respect to the constitutional rights of pretrial detainees; failure to adequately discipline deputies involved in misconduct; retention of deputies with a propensity for excessive force; failure to provide adequate medical care to inmates; encouragement to deputies to violate inmates' rights; failure to provide adequate medical care; failure to practice and enforce proper reporting and investigation of use of force by deputies; and "ratification by the highest levels of authority" of constitutional violations. Compl., p.13. He also alleges that the County's policies, practices and customs caused his injuries due to an ongoing pattern and practice of calculated brutality and harassment by jail deputies unrelated to any penological interest. *Id.* Finally, he alleges the County is liable in respondeat superior for the torts of its employees committed in the scope of their employment.

A *Monell* allegation requires a plaintiff to prove that "action pursuant to official municipal policy caused plaintiff's injury." 436 U.S. at 691; *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Those policies can include "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.* But they cannot be proven through reference to a single unconstitutional activity unless "proof of the incident includes proof that it was caused by an existing, unconstitutional [municipal] policy." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985). In other words, "respondeat superior and vicarious liability are not cognizable theories of recovery against a municipality." *Miranda v. Clark County, Nevada*, 279 F.3d 1102, 1109-10 (9th Cir. 2002), aff'd in part en banc, 319 F.3d 465 (9th Cir. 2003).

---

[7] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

14cv2911 BEN (NLS)

A policy can also be shown where a municipality's failure to train its employees in a relevant respect amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  When the allegation includes a failure to train employees, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference." *Bd. Of the County Comm'Rs v. Brown*, 520 U.S. 397, 409 (1997).  But "[w]ithout notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.  Further, the alleged incidents must constitute actual constitutional violations.  *Id.*

Here, there is no showing that the instance of Torbert's arm getting slammed in the door was done pursuant to an existing municipal policy that promoted use of excessive force.  There is also no showing that the County's failure to train its employees resulted in a deliberate indifference to Torbert's condition.  Further, there is no showing of a pattern of similar constitutional violations.  And based on all of Torbert's claims alleged here, there is only one potential claim—for the slamming of the door on his arm—that presents a factual question as to whether that act resulted in a violation of Torbert's constitutional rights.  This court finds no question of fact as to the County's *Monell* liability.  Accordingly it recommends the district judge **GRANT** summary judgment in favor of the County as to all *Monell* claims, including on the basis of respondeat superior.

## C. Government Liability: Claims Against Sheriff Gore.

Torbert sues Sheriff Gore in his official and individual capacities.  Compl., p.14.  But the claims against Sheriff Gore in his official capacity are duplicative of his claims against the County.  Official capacity suits [under § 1983] . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985) (quoting *Monell*, 436 U.S. at 690, n.55); *see Brandon v. Holt*, 469 U.S. 464, 472 (1985) (actions of department head in his official capacity akin to actions of municipality itself).

14cv2911 BEN (NLS)

As for individual liability, supervisory prison officials may only be held liable for the allegedly unconstitutional violations of a subordinate if the plaintiff shows (1) how or to what extent they personally participated in or directed a subordinate's actions; and (2) in either acting or failing to act, they were an actual and proximate cause of the deprivation of the plaintiff's constitutional rights. *See Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

Torbert does not present any evidence of individualized constitutional wrongdoing by Sheriff Gore. For example, he does not allege that Gore directed subordinates to use excessive force on Torbert or ignore his medical needs. He does not show that Gore even knew about his condition, or that he denied any requests for medical treatment. In sum, there is no basis to hold Sheriff Gore liable in either his personal or individual capacity. This court recommends that the district judge **GRANT** summary judgment in favor of Sheriff Gore on all claims.

### D. State Law Claims.

Torbert alleges several supplemental state law claims. Compl., pp. 8, 26, ¶¶3, 56-60. He makes a few allegations on the ADA claim. *Id.* But for all others he just lists the name of the claim and provides no facts. Compl., p.8.

### 1. Failure to Summon Medical Care.

California allows a claim against an entity or public employee if the defendant was aware that the plaintiff required immediate medical attention yet failed to summon that care. Cal. Gov't Code § 845.6. To state a claim, a prisoner must establish: "(1) the public employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care." *Jett v. Penner*, 439 F.3d 1091, 1098-99 (9th Cir. 2006) (citation omitted). "Liability under section 845.6 is limited to serious and obvious medical conditions requiring immediate care." *Id.*

There is no evidence here that Defendants failed to reasonably summon medical care for Torbert the evening of the October 2 incident. The morning after his arm was slammed, he received medical care. He then received ongoing medical evaluations for

his arm over the next several weeks.  This court has found that Defendants were not deliberately indifferent to his serious medical needs.  Similarly, it finds no violation under section 845.6, and recommends that the district judge **GRANT** Defendants summary judgment as to the California Government Code section 845.6 claim.

### 2.  Failure to Discharge a Mandatory Duty.

Torbert argues that Defendants violated their duty to provide medical care. California law provides:

> Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.

Cal. Gov't Code § 815.6.  But liability attaches only where there was a failure to provide immediate medical care.  *See id.*; *California v. Superior Court*, 150 Cal.App.3d 848, 854 (1984).  This court did not find a violation under section 845.6 for failure to summon medical care.  Accordingly, it recommends that the district judge **GRANT** Defendants summary judgment as to the California Government Code section 815.6 claim for failure to discharge a mandatory duty.

### 3.  Government Immunity.

Torbert states a claim for "Negligence (Gov. Code § 844.6)."  Compl., p.8.  He alleges no supporting facts.  But the section he cites says the Government is immune for injuries sustained by a prisoner, unless otherwise provided under the Government Code. Cal. Gov't Code § 844.6.  A California appellate court found this statute constitutional, "[h]aving found a rational relationship between the statute and the governmental interest[.]"  *Hughes v. County of San Diego*, 35 Cal.App.3d 349, 351-352 (1973).  Thus, there is no basis here for Torbert to prevail on a negligence claim.  Accordingly, this court recommends that the district judge **GRANT** Defendants summary judgment as to the California Government Code section 844.6.

### 4. Tort Claims.

Torbert alleges four tort claims. A plaintiff must comply with the California Government Tort Claims procedure before a "suit for money or damages may be brought against a public entity." Cal. Gov't Code § 945.4. In federal cases, supplemental state law claims are subject to this claims filing requirement and the law governing such claims. *Karim-Panahi v. LAPD*, 839 F.2d 621, 627 (9th Cir.1988).

Here, Torbert never filed a government tort claim with the County of San Diego regarding the incidents at issue here. Kapualani Decl. ¶¶ 2-4. He also does not allege any facts specific to these claims. As such, Defendants are entitled to summary judgment with regards to Torbert's medical malpractice, negligence, battery and intentional infliction of emotional distress claims. Accordingly, this court recommends that the district judge **GRANT** summary judgment to Defendants based on these tort claims.

### 5. Bane Civil Rights Act.

The California Bane Act is an enabling statute that allows a party to recover damages if that party can provide a violation of his or her federal or state constitutional rights. Cal. Civ. Code 52.1. It is limited to instances where threats, intimidation or coercion is used to accomplish the constitutional violation. *Id.* It requires that "the coercive force applied against a plaintiff must result in an interference with a separate constitutional or statutory right." *Rodriguez v. City of Fresno*, 819 F.Supp.s 937, 954 (E.D. Cal. 2011). In other words, it does not apply to a plaintiff's allegation of excessive force absent a showing that the force was done to interfere with a separate state or federal constitutional right. *Justin v. City and County of San Francisco*, 2008 WL 1990819, at *9 (N.D. Cal. May 5, 2008).

Here, it is not sufficient that the right potentially violated is the one to be free of the force or threat of force that was applied. And, Torbert provides no evidence of a violation of a separate state or federal constitutional right, as required under the Bane Act. Accordingly, this court recommends that the district judge **GRANT** summary judgment for all Defendants as to Torbert's claim under California's Bane Act.

### 6.  ADA Claim.

In his Americans with Disabilities Act (ADA) claim, Torbert alleges that prison officials cannot require him to perform work that is beyond his strength, is dangerous to his health or is unusually painful.  Compl., p.20, ¶ 60.  But Torbert cannot prove any sort of claim under the ADA.[8]  In a Title I case for employment discrimination, the prison officials are not Torbert's employer, so he cannot make out such a claim.  *Damron v. North Dakota Com'r. of Corrections*, 299 F.Supp.2d 970, 976 (D.N.D. 2004).  In Title II ADA claims, prison officials cannot be sued individually because the Act prevents discrimination by public entities, and not by individual prison officials.  *See* 42 U.S.C. § 12132.  The facts of this case do not lend themselves to any cognizable claim for alleged discrimination in public accommodations.  Finally, Torbert stipulated—on the record at his deposition—to dismiss his ADA claim.  D-NOL, Ex. A, 132:1-16; 135:7-14.  For these reasons, this court recommends that the district judge **GRANT** summary judgment as to all Defendants on the ADA claim.

## IV.    REQUEST FOR JUDICIAL NOTICE

Defendants request judicial notice of the parole documents that were part of Torbert's court file that show he was on parole at the time he was arrested in August 2014.  Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."  Fed. R. Evid. 201(b).  Additionally, a "court shall take judicial notice if requested by a party and supplied with the necessary information."  Fed R. Evid. 201(c).  Judicial notice, however, is inappropriate where the facts to be noticed are irrelevant.  *Ruiz v. City of Santa Maria*,

---

[8] The ADA is organized under three titles.  Title I of the ADA applies to employment discrimination.  *See* 42 U.S.C. §§ 12111-12117.  Title II applies to discrimination in public services.  *See* 42 U.S.C. §§ 12131-12165.  Title III applies to discrimination in public accommodations.  *See* 42 U.S.C. §§ 12181-12189.

160 F.3d 543, 548 n.13 (9th Cir. 1998); *Turnacliff v. Westly*, 546 F.3d 1113, 1120 n.4 (9th Cir. 2008).

A court may take judicial notice of records in another proceeding but not the "facts essential . . . [to the case] before it." *M/V American Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983) (alteration in original) (citation omitted). Here, Torbert raises the question of whether he was on parole as a fact essential to this case. While the court found that he was on parole for the purposes of this motion, it does not find judicial notice of that fact appropriate. Accordingly, the request for judicial notice of the documents in Exhibit B in Defendants' Notice of Lodgment is granted as to their existence but without regard to their truth or any findings of fact.

## V.    CONCLUSION

This court **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED in part** and **DENIED in part** as follows:

1.  **DENY** summary judgment on Claim 1 as to Defendant Dailly for the October 2 incident.

2.  **GRANT** summary judgment on Claim 1 as to Defendants Estrada, McMahon and Gebregiorgis for the October 2 incident.

3.  **GRANT** summary judgment on Claim 1 as to all Defendants for the October 21 incident.

4.  **DENY** summary judgment on the basis of qualified immunity.

5.  **GRANT** summary judgment on Claim 2 in favor of all Defendants.

6.  **GRANT** summary judgment on Claim 3 in favor of all Defendants.

7.  **GRANT** summary judgment in favor of the County as to all *Monell* claims, including on the basis of respondeat superior.

8.  **GRANT** summary judgment in favor of Sheriff Gore on all claims.

9.  **GRANT** all Defendants summary judgment as to the California Government Code section 845.6 claim.

/ / /

10. **GRANT** all Defendants summary judgment as to the California Government Code section 815.6 claim for failure to discharge a mandatory duty.

11. **GRANT** all Defendants summary judgment as to the California Government Code section 844.6.

12. **GRANT** all Defendants summary judgment for the medical malpractice, negligence, battery and intentional infliction of emotional distress claims.

13. **GRANT** all Defendants summary judgment for the claim under California's Bane Act.

14. **GRANT** all Defendants summary judgment on the ADA claim.

In sum, this court recommends that the only claim to remain in this case be Claim 1 for excessive force in the October 2 incident, and that the only Defendant to remain be Defendant Dailly. This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than **September 6, 2016**, any party to this action may file written objections and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections must be filed and served on all parties no later than **September 16, 2016**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  August 15, 2016

Hon. Nita L. Stormes
United States Magistrate Judge

14cv2911 BEN (NLS)