1
2
3
4
5                    UNITED STATES DISTRICT COURT
6                  SOUTHERN DISTRICT OF CALIFORNIA
7
8    JAVON LAMAR TORBERT,                   Case No.:  3:14-cv-02911-BEN-NLS
9                             Plaintiff,
                                            **ORDER GRANTING DEFENDANT'S**
10   v.                                     **MOTION FOR SUMMARY**
                                            **JUDGMENT**
11   WILLIAM GORE, et al.,
12                          Defendants.     **[Doc No. 214]**
13
14         Plaintiff Javon Lamar Torbert ("Plaintiff"), formerly a state prisoner, brings the
15   instant *pro* se action under 42 U.S.C. § 1983, alleging that he was subjected to excessive
16   force by San Diego County Sheriff's Deputy James Dailly ("Defendant") on October 2,
17   2014.
18         Defendant filed a Motion for Summary Judgment to which no response was filed
19   by Plaintiff.  After review of this Motion, the Court finds that the Motion for Summary
20   Judgment should be granted.
21                        **PROCEDURAL BACKGROUND**
22         Initially, this action involved multiple incidents, numerous theories, and multiple
23   Defendants.  (Doc. No. 214 at 1.)  However, Defendants brought a motion for summary
24   judgment which was partially granted by dismissing all the claims, with the exception of
25   the § 1983 excessive force claim against Defendant.  *Id.*  The excessive force claim was
26   later dismissed, only to be reinstated by the Ninth Circuit after Plaintiff appealed the
27
28

                                          1.

dismissal of his claims.[1] *Id.* Following Defendant's initial motion for summary judgment, the Supreme Court issued a series of decisions in 2017, 2018, and 2019, addressing and clarifying the doctrine of qualified immunity in the context of excessive force by law enforcement.[2]

## FACTUAL BACKGROUND

Plaintiff's remaining claim for excessive force arises out of an incident occurring on October 2, 2014, at the Vista Detention Center when Defendant closed a cell door that allegedly hit Plaintiff's left forearm. Video footage captured the incident.

On the day of the incident, Plaintiff was causing tension in Medical Ward 2, where he was being housed with other inmates. Specifically, Plaintiff was yelling and disturbing the other inmates while he paced back and forth on the ward *without the use of his cane.* In response to Plaintiffs actions, Deputy Estrada told Plaintiff to gather his belongings so that he could be moved to a different cell. When Plaintiff refused to submit to handcuffing through the cell door, Deputies Dailly and McMahon entered Medical Ward 2 in order to calm and escort Plaintiff to the medical isolation cell. Due to Plaintiff's threats and unpredictable behavior, Deputy Dailly picked up Plaintiff's cane (*which had been hanging on his bunk bed*) as a safety precaution to ensure Plaintiff did not use it as a weapon. As the Plaintiff gathered his belongings, he continued to threaten the deputies causing additional deputies being summoned to assist with the Plaintiff's

---

[1] The Ninth Circuit held that when "[v]iewing the evidence in Torbert's favor, a fact question remains as to whether defendant Dailly's use of force was excessive even if Torbert's injuries were not lasting and significant. *See Kinglsey*, 135 S. Ct. at 2473; *Martinez*, 323 F.3d at 1184; *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) (reversing a dismissal based on 'the supposedly *de minimis* nature of [the inmate's] injuries'). We reverse the judgment in part and remand for further proceedings on the excessive force claim against defendant Dailly only." (*See* Doc. No. 212)

[2] These cases included: *White v. Pauly*, 137 S. Ct. 548 (2017), *Kisela v. Hughes*, 138 S. Ct. 1148 (2018), and *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500 (2019).

transfer.[3] A couple minutes later, several other deputies arrived in Medical Ward 2. With the other deputies present, Defendant returned Plaintiff's cane so he could use it to walk to the medical isolation cell.

When they reached the medical isolation cell, Plaintiff faced the wall opposing the door while Defendant unlocked the door. With the door open, Plaintiff turned and began to walk into the cell. The video footage shows that as Plaintiff entered the new cell, his arm remained outstretched-either maintaining a grasp on the cane or trying to reach for the cane that Defendant had in his own grasp-when Defendant closed the cell door. Defendant declares that he sought to take the cane as he was concerned Plaintiff might use it as a weapon. It appears the door hit the cane handle or part of Plaintiff's appendage prior to latching. The door moved forward to close, slightly retreated backward upon coming into contact with something, and then resumed its forward travel and latched. Defendant appeared to use average force to close the cell door. The incident took place over three seconds.

Plaintiff states that, as a result of the door hitting him, his forearm was swollen and his fingers could not squeeze anything. He pushed the emergency button for help. Deputy McMahon and Dr. Alfred Joshua, Chief Medical Officer of the San Diego Sherriff's Department, declare that medical staff was unable to treat Plaintiff that night because he was acting unpredictably. However, Defendant provided Plaintiff with three Tylenol that evening.

The next morning, on October 3, 2014, Dr. Martinez examined Plaintiff's forearm and ordered an X-ray to rule out a fracture. On October 4, 2014, Plaintiff complained of chest pain and was taken to Tri-City Medical Center. Cardiac tests were negative, and X-ray images of his left wrist and forearm were negative for fractures. At the time, Plaintiff was taking three pain medications. He received a sling for his arm.

---

[3] Deputies McMahon and Estrada declared that Plaintiff had said they would need more deputies to assist with Plaintiff's transfer, which they perceived to be a threat.

3

1    On October 7, 2014, a jail nurse examined Plaintiff and noted that he was able to
2    move his left fingers and that he remained on pain medications. Fifteen days after the
3    incident, on October 17, 2014, Dr. Serra examined Plaintiff and noted that he was no
4    longer taking two of the three pain medications. That same day, Deputy Brown observed
5    Plaintiff doing pull-ups and push-ups in the medical housing unit. He warned Plaintiff
6    that working out is not permitted in the medical ward. Deputy Brown prepared a report
7    detailing the incident.

8        On October 21, 2014, Dr. Sadler examined Plaintiff, the fourth physician to
9    examine his forearm. Plaintiff requested a referral to a neurologist for nerve damage to
10   his arm, which Dr. Sadler thought unwarranted given her exam of him. Medical records
11   indicate that Plaintiff complained that his left elbow had been hurting since he started
12   doing push-ups. Plaintiff sought pain medication but refused Motrin. Dr. Sadler noted
13   that Plaintiff showed decreased strength in his left arm but suspected it was due to poor
14   effort on Plaintiff's part. The records also indicate that Plaintiff had been using his left
15   hand spontaneously and was using his arm without difficulty when not being examined.

16                              **LEGAL STANDARD**

17   **A.    Summary Judgment.**

18       Summary judgment is proper where the pleadings, discovery, and affidavits show
19   that there is "no genuine dispute as to any material fact and [that] the moving party is
20   entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant
21   summary judgment "against a party who fails to make a showing sufficient to establish
22   the existence of an element essential to that party's case necessarily renders all of their
23   facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is
24   material if it might affect the outcome of the suit under governing law, and a dispute
25   about a material fact is genuine "if the evidence is such that a reasonable jury could
26   return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
27   242, 248 (1986).

28

4

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Plaintiff's Complaint was signed "under penalty of perjury" and therefore is considered as evidence for purposes of deciding the motion.

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id.* at 631.

**B.    Qualified Immunity**.

The defense of qualified immunity protects "government officials ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties

reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "swiftly and firmly" in situations where the rules governing their actions are often "voluminous, ambiguous, and contradictory." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citation omitted). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*

To determine whether a government official is entitled to qualified immunity, courts must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232.

"An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent … placed the statutory or constitutional question beyond debate." *City and County of San Francisco, Cal v. Sheehan*, - U.S. -, 135 S. Ct. 1765, 1774 (2015) (alteration and omission in original; citation omitted). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.* (alteration in original; internal quotation marks omitted). Furthermore, a district court may address these questions in the order most appropriate to "the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236, 242 (2009). Thus, if a court determines that Plaintiff's allegations do not support a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

///

///

6

**DISCUSSION**

Defendant moves for summary judgment in his favor on Plaintiff's section § 1983 excessive force claim on the ground that he is entitled to qualified immunity. Because Plaintiff cannot identify any case law or other authority in existence at the time of the incident that would have alerted Defendant to the illegality of his actions, Defendant Dailly is entitled to qualified immunity.

**A.   Fails to Identify Clearly Established Law Before October 2, 2014.**

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017) (quoting *Mullenix v. Luna*, - U.S. -, 136 S. Ct. 305, 308 (2015)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful[.]" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (denying qualified immunity to prison guards who handcuffed an inmate to a hitching post as punishment, even though no earlier cases had materially similar facts).

Plaintiff has not identified any clearly established Supreme Court or Ninth Circuit case law prior to the October 2, 2014 incident. No cases held or suggested that deputies in a correctional setting dealing with a threatening and agitated inmate cannot remove a cane and confine that inmate by quickly closing a cell door. No cases held that closing a cell door would result in a violation of a detainee's constitutional rights, even if the inmate's hand were to get struck by the door.

The Court finds Defendant's argument to be sound. Defendant found no factually analogous precedent in the Ninth Circuit either. However, Defendant cites decisions from several other circuits that addressed similar force in similar situations, finding the

force used in those situations did *not* violate the Eighth Amendment.[4] *Id.* at 9-10. For example, in *Outlaw v. Newkirk*, 259 F.3d 833 (2001), the Seventh Circuit found that a similar incident, involving the closing of a door on a prisoner's hand, was not a violation of the Eighth Amendment and the officer was entitled to summary judgment.[5] *Id.* at 9. This shows that a reasonable officer in Deputy Dailly's position, with an absence of precedent in the Ninth Circuit, would reasonably believe that similar force used in this case was constitutionally permissible. *Id.* at 10. Third, "generic arguments such as those based on the general proposition that a prison official who uses force against an inmate without provocation may violate the Eighth Amendment or that Defendant Dailly violated Plaintiff's right under the Eighth Amendment as established in *Hudson*, 503 U.S. at 6-7, are wholly insufficient and should be disregarded."[6] *Id.* at 8. Thus, it is clear that "there was, and is, no clearly established law that would have put Defendant on notice that closing a door against an unrestrained and agitated inmate who is attempting to maintain hold of a weapon would violate the Eighth Amendment." *Id.* at 11. Therefore, Defendant's assertion of qualified immunity is valid since he was not "on notice" that

---

[4]    Several decisions that involved allegations that correctional officer improperly crushed a hand or foot in a door have resulted in dismissals on the grounds that no constitutional violation occurred. *See, e.g., Jenkins v. Wiegel*, No. 13-cv-285-jdp, 2014 WL 4265838 (W.D. Wis. 2014); *Robinson v. Karnes*, No. 2:02-CV-0246, 2003 WL 22137176 (N.D. Tex. 2003). (Doc. No. 214 at 10.)

[5]    "The court found that the closing of the door was warranted by the security concerns presented by prior instances of inmaters occasionally throwing harmful objects through the door, and prior attempts by prisoners to grab guards through the cuff ports, both which present a hazard to the guards. Further, the court found that the injuries of swelling, tenderness, and discoloration and an inability to move two fingers was a minor injury indicating the force used was *de minimus* and did not rise to the level of an Eighth Amendment violation." (Doc. No. 214 at 10.)

[6]    "These types of arguments are exactly the type of 'high level of generality' rejected by the Supreme Court in '*White v. Pauly*, 137 S. Ct. 548 (2017).'" (Doc. No. 214 at 8.)

closing the cell door, forcefull or not, was "clearly unlawful." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

**B.     Violation of a Constitutional Right**.

As discussed above, the Plaintiff's allegation does not support a finding of a statutory violation by identifying clearly established law prior to October 2, 2014, which demonstrates the Defendant's actions were constitutionally impermissible. Accordingly, there is no necessity for further inquiry concerning qualified immunity.

## CONCLUSION

Defendant's Motion for Summary Judgment is **GRANTED**. The Plaintiff's claim against the Defendant is hereby dismissed.

**IT IS SO ORDERED.**

DATED: January 30, 2020

HON. ROGER T. BENITEZ
United States District Judge